Good afternoon, Your Honors. May it please the Court. The substantive provision of the Title VII's basic objective of equality of employment opportunities and the elimination of practices that tend to bring about a stratified job environment would be achieved were all employment related discrimination miraculously eliminated. That's what the Supreme Court noted in Burlington Northern and Santa Fe Railway v. White. But until then, we have the law to protect against such stratified discrimination by allowing genuine disputes of material facts to be tried by a jury. Mr. Vincent Mercer asked this Court to reverse the lower court and remand for a jury trial based upon both the race discrimination charge and the retaliatory charge from PHH Corporation because he has exhausted his remedies of race discrimination even under the Sidnor anti-tripwire doctrine and because genuine and material disputes of fact exist regarding his retaliation charge such that his case must be tried by a jury. Your Honors, as to the first issue under the Sidnor anti-tripwire doctrine, the Fourth Circuit held that penalizing a plaintiff solely for failing to check a box race discrimination on the form was not grounds to dismiss a pro se complainant in the process of filing a discrimination charge. The test, Your Honor, has four parts to it. First, that the allegations in the administrative documents have alleged the same place of work and the same actors as in the documents filed in court. Second, the county was, or in this particular case the county was on notice, so the charge must put the party on notice from the beginning that it was discriminating. Third, there should not be a shifting of explanations and accusations in the discrimination charge. And fourth, there should be clear references to the points raised of discrimination. Your Honors, this issue is designed, and these tests are designed, as the Supreme Court has stated, to not cause a pro se plaintiff to trip over themselves trying to allege what has happened. And in my client's case, although the particular individual assisting him in the Maryland Commission on Civil Rights to fill out the form apparently may have failed to check a race box, however, as we noted in our brief, the racial discrimination allegations were made by my client substantively. They were clearly delineated and affirmed under oath by my client that he felt he was racially discriminated against. And particularly, he mentioned the words that had created this discrimination, belief in his mind, such being the slave ships and whips and the climbing a ladder as a monkey for a banana and the fire hoses being used. Your Honor, these issues created the context in my client's state of mind to file a discrimination complaint, and it substantively must go forward. Your Honor, opposing counsel cites Evans and Technologies Applications and Service Company as a failure to check a box on a form, creating a situation where the allegations should be there was very little evidence in the record and very little allegation to say that there was a discriminatory motive. And my client was very clear as a pro se complainant that he felt that there was discrimination. He was very clear when he was publicly challenged by one of his managers in a managerial meeting. Within 15 days of insisting on the email apology, he was publicly challenged and berated, saying, quote, you're not a team player. That came on the heels of his protected activity, Your Honors. And that is in the context of his discrimination complaint. Additionally, Your Honor, the complaint that my client set forth very clearly stipulated to Title VII, and it says that he felt he was discriminated against and retaliated against. And so in the context of my client's affirmation of that complaint, he clearly made out the racial discrimination charge. Finally, Your Honor, as I set forth in the brief, the defendant, the respondent in the complaint, from the very beginning opposed my client's filing under both the racial grounds, racial discrimination grounds, as well as under the retaliation grounds. And so notice was had from the very beginning. Your Honor, Your Honors. The allegations, tell me about Ennis. Ennis being the HR employer, employee who is the protected activity and the termination. Thank you, Your Honor. Rita Ennis is the HR individual that was in charge of PHH Arvill Corporation, the Baltimore element. And she actually was part of the protected activity process where my client went to her and And I'm sorry, let me be maybe a little more specific because I didn't give you much to point me to evidence in the record that Ennis had was implicated or had anything to do with initiating the investigation of the call center incident. Incidents. Yes, Your Honor. There is evidence in the record. There is evidence that she was in direct communication with Kimbo Lynn. And she actually, as I noted in the brief, she the review of the investigation. There are questions of fact where she has there's disputed material facts in this regard where she has said that she was not directly. And I'm sorry, my question was, was she involved in initiating the investigation? Your Honor, that's a materially disputed fact. It's a disputed fact in the record whether or not she was directly involved. We believe she was. Okay. Can you point me to the evidence in the record with respect to that point? And don't take time now, but if you, when you sit down and rebuttal, perhaps you could help me with that. Absolutely, Your Honor. And I would point you to the appendix three, which is confidential sealed in that document. And I will be happy to go over that in rebuttal as well. Thank you. In that document, there is a very clear interaction as part of the investigation. Rita Ennis is part of that process. Please, my question has to do with initiating the investigation. Thank you. And I will review that and provide an answer on rebuttal, Your Honor. And Your Honors, I would also wish to point to the general, the genuine material disputes. In the brief, I outlined merely four major issues. And there are numerous, as was filed in the opposing brief, over 30 pages of disputed facts is what I set forth as appearing to me because the facts that the respondent has set forth disputes on nearly every material point, the facts in the record. How does the fact that he engaged in a protected activity, how does that mitigate his culpability for the call flipping? I'm sorry, Your Honor. He was fired. One could say that he was fired because of the call flipping. Because his co-worker was fired for that reason, too. I missed the question. How does his engagement in a protected activity mitigate against the misconduct of call flipping? Well, Your Honor, that actually is a material fact in dispute. How is it material? There's no question that he engaged in call flipping. Your Honor, the question isn't, and the test for this court isn't whether or not he performed particular duties that the employer wished to fire him for. The test instead is whether or not he was directed to do that, and that's the material question in fact. Actually, it isn't. There really, as I read it, he engaged in the behavior, did he not? And he was the other individual who was, and this goes to pretext, which I had a little trouble with in your analysis. And you have two problems, it seems to me, in that regard. The, he was terminated, he was treated the same as his white colleague was with respect to discipline for the call flipping incident. And he was replaced by an African-American female. So that, for the pretext query, you have two problems in your argument. Your Honor, the court has held that, the Supreme Court has held that the use of the law should not be manipulated by clever plaintiffs. Well, it's pretty basic. You have to show that the action was taken on the basis of his race. And you know, I'm sure better than anyone, the inferential proof process under McDonnell Douglas. And you have, and the employer says, race was, the reason for the discharge was not pretextual, and you look at, one of, two of the things you can look at is, was he treated similarly to other people, and who was hired as a result. And in both of those instances, the selections and the actions refute the suggestion that the act was taken on the basis of race. And Your Honors, if you wish to take that standard as a facial review, and not look into the substance. Well, I'm actually not taking, that's the McDonnell Douglas paradigm, isn't it? But it must include an analysis and a factual determination, Your Honor. And in this case, the court found facts to determine that those two issues cleared the company of any wrong, potential wrongdoing. But how, how, okay. You have, you have to get to some dispute about the material fact for purposes of a, the analysis of pretext. And on its face, what calls into question the, the argument that the, the discharge was pretext? Multiple issues, as I've outlined in my brief, and I defer to that. But, but particularly here, Your Honors, the white individual was fired after my client. That's a key fact in this case. And in the record, Your Honors, in the investigation process, what is stipulated to is a repeated reference that the white individual who was fired after my client was the only individual that directed employees to place calls on hold, which the company tried to assume or tried to infer was a wrongdoing. Your Honors, that action was never attributed directly to my client. They even say in the investigation notes that my client was copied on the notes. In fact, one of the notes, Your Honor, in the appendix says, well, we see Mr. Naisman is the only one issuing emails and then almost as if they are looking for something to find against my client, they say this, but Mr. Mercer was copied on those emails. And Your Honor, as we've set forth in the record, that is insufficient. And, and if, if a company wishes to cleverly manipulate the law, what would they do? They would do exactly what they did in this case. They would look for someone to be a sacrificial lamb and that's who Mr. Naisman is, who was fired after my client was fired, who was the only individual who actually in writing instructed the alleged wrongdoing of putting calls on hold. Secondly, Your Honor, they would replace my client with an African American individual. And I would proffer, Your Honor, that, that is exactly why they did that. They did it to assume a, a, an appearance that my client, that they were not committing a wrongdoing. But with all the facts, substantively though, point to a dispute as to whether or not this was a, a investigation directed, Your Honor, completely towards eliminating my client because of his protected activity. And Your Honor, I see my time has expired. Thank you very much. Thank you, Mr. Connolly. I reserve my time on rebuttal. Mr. Wozniak. Good afternoon. May it please the Court. Garrett Wozniak on behalf of PHH Corporation Appellee. Briefly on Mr. Mercer's race claim, Your Honors. Mr. Mercer did not exhaust administrative remedies with regard to that claim. Yes, it is true he did not check the box on his charge, page 295 of the joint appendix, but nor did he include in his narrative any allegation, even an allegation that could reasonably be construed to hint that he was terminated because of his race. Yes, Mr. Mercer references Mr. Salito's comments, which led to Mr. Mercer's complaints and protected activity, but nothing linking Mr. Mercer's termination to his race. And for those reasons, the lower court was correct in dismissing the race discrimination claim for failure to exhaust. And that conclusion is only bolstered by reference to Mr. Mercer's complaint, page 5 of the joint appendix, and his civil cover sheet, page 13, where he references only retaliation. He said he was discriminated against by being retaliated against. So the lower court were to get beyond that and conclude that Mr. Mercer had exhausted his administrative remedies. He has not established a prima facie case of race discrimination. Mr. Namesman, a Caucasian employee who was terminated on the same day, maybe after Mr. Mercer, but on the same day, and that is undisputed, he was replaced by an African American, Ms. Deborah Smith. And again, there's no context. There's nothing in the record. There's no part of the story linking Mr. Mercer's race to his termination. Her replacement was sort of short-lived, wasn't it? Wasn't her job eliminated shortly thereafter? The position was eliminated, but the employee remained employed by PHH Corporation, Your Honor. Just long enough to be in his place, though? There's nothing indicating that it was any sort of underhanded motive for replacing Ms. Smith in this position, Your Honor. That's what he said. He said it's very convenient that he was replaced by an African American, and then shortly thereafter, the position is eliminated. He does say that, Your Honor, but there is nothing in the record that supports any ulterior motive to Ms. Smith's placement in that position, especially when you consider that Mr. Namesman was terminated at the same time. PHH's longstanding support for the Diversity Committee, of which Mr. Mercer was chair. Well, counsel says there's no evidence disputed as to whether he actually personally engaged in this call scheme, if you will, device. Yeah, sure, Your Honor. Is that true? Counsel is incorrect, Your Honor. There is no genuine dispute of material fact regarding the call flipping scheme that occurred at PHH Corporation. In June 2010, Mr. Namesman came up with the call flipping idea. Mr. Namesman was his counterpart in the BTR call center. They were the two supervisors in the department. Okay. They were the only two individuals who instructed, where there's evidence that they instructed individuals. What is the evidence that Mr. Mercer did so? Sure. Pages 588 through 596 of the joint appendix is the investigation report. And that report shows that of the six individuals who were interviewed, the two team leads who reported to Mr. Namesman and Mr. Mercer, Boazia Moncourt and Chris Kutek, both reported that they were instructed by Mr. Mercer and Mr. Namesman to engage in call flipping. And of course, Mr. Cox referenced the emails, pages 260 to 262. Didn't Mr. Mercer deny that? He was directly involved? Mr. Mercer did not deny that call flipping occurred or that he was even aware that it occurred. Then it occurred, but didn't he deny that he was directly involved? He did not deny that he was directly involved. The record is clear. Did he admit that he was? Absolutely, Your Honor. So you said, so counsel just misrepresented the facts to us? That would be a mischaracterization of the record. Pages 103 to 106 of the joint appendix shows that Mr. Mercer was fully aware of his agents on his team in the BTR call center were engaging in call flipping. My recollection, and I may be wrong about this, is that Mr. Mercer's defense was that he didn't originate the idea? Mr. Mercer did not originate the idea, and that is also undisputed. Mr. Namesman came up with the idea in June 2010. But he also said that your company was aware of that and approved it. There is no evidence in the record that PHH approved call flipping. Allow me to maybe clarify. So there were two processes in place in the May-June timeframe. In May, Mr. Mercer came up with a process known as triage or the special client services team. That process involved when a call came in, the agent would get basic information from the caller and then inform the caller that they would receive a return call in 30 minutes. Mr. Mercer explains this process at pages 103 to 106. And it's documented in the record as well, in pages 530 to 536, on a document that was in place instructing agents on how to perform. After that process, after Memorial Day 2010, Mr. Namesman came up with a call flipping idea. And the difference between triage and call flipping is that instead of the agent taking basic information and informing the caller that they would receive a call back in roughly 30 minutes, the agents would flip the call to extension 16310 or skill set 427, the same thing, go by different names, where they would sit in limbo on hold for sometimes over 50 minutes. That was the call flipping, which is distinguished from the triage process. Mr. Mercer was aware of the call flipping. There's evidence during the investigation that he instructed his agents to engage in call flipping. And that was the reason that he and Mr. Namesman were ultimately terminated. All right. So someone told the investigators that they were directed, they were told directly by Mr. Mercer to do that. Absolutely. And Mr. Moncourt and Mr. Kutek are the team leads in the department who directly reported to Mr. Mercer and Mr. Namesman, who gave that information during the investigation. In his administrative complaint, where the word entitled, on the form entitled discrimination based on, he checked retaliation but not race. And then at the conclusion of that complaint, I believe he said, I believe I was discriminated against and subject to retaliation for engaging in a protected activity in violation of Title VII. Does he anywhere in that administrative complaint talk about race? He talks about race solely, and you're referring to page 295, Your Honor. I don't have the number. He refers to race in the context of Mr. Salito's comments, which occurred in March 2010. He does not refer to race with regard to his termination. All he says is that he was discriminated against. But if simply saying that I was discriminated against is enough to encapsulate all the various protected classes, then it would alleviate the need and remove the need to exhaust administrative remedies. So the answer is no, Your Honor. That narrative does not encapsulate race discrimination. So we have jurisdiction based on that absence? I'm sorry, I didn't hear your question. Do we have jurisdiction for failure to exhaust his administrative remedies? Does that mean we don't have jurisdiction? The district court would not have subject matter jurisdiction. That's why dismissal of the race discrimination claim was proper, the proper way to dispose of that claim, Your Honor. So that leaves the retaliation claim? The race discrimination claim, Your Honor, was properly dismissed. The retaliation claim. So that leaves the retaliation claim? Yes, Your Honor. And the undisputed genuine facts in this case show that in March 2011, Mr. Salito made comments. He made comments, off-the-cuff comments, referring to the movie Ben-Hur and about a study by McKenzie and Company. The Ben-Hur comment was in reference to the beat of a drum on a slave ship in this movie, this classic Charlton Heston movie that most folks have probably seen. Birth of a Nation is a classic movie, too. Fair point, Your Honor, although different subject matter. I know it is, but you thought as if it's exonerated because it's a classic. I just want to get your film history correct on that. Fair enough. All right. Mr. Salito made those comments. It's undisputed that he made those comments. It's also undisputed that he referenced the McKenzie and Company study about monkeys climbing a ladder to reach a banana. What was the point of that? What point did he make with his workforce on that? Well, the point he was attempting to make, Your Honor. With slave ships and beats them out with a whip. Tell me, what point did he want to bring home to his employees under his servitude, I suppose? Mr. Salito's testimony at deposition was that there was a sense that he was a taskmaster, and he was just driving his workers too hard. And his point was, his attempted point, was that he was not beating the drum on that slave ship. He was not trying to be a taskmaster. Why don't you just confess error on that one and say that it should never have been said? He did. I mean, he apologized. It was offensive. There's no justification for it. Why defend it? I'm not defending. I was just attempting to provide some context for the statement. But you're absolutely right, Your Honor. He apologized, and he realized. He apologized after he was pushed by Mr. Mercer, didn't he? But nonetheless, he apologized. But he was pushed, and that's the genesis of the retaliation. They said he didn't like that because he was saying that you've got to tell the whole narrative because it's supposed to be in the light most favorable to the non-moving part. Sometimes in Title VII it's kind of hard to remember that. But he said, no, it's not enough for you to just say that to me in this room. You need to say this to everybody. He was pushed on that point. And there are inferences that that was not the most pleasant thing, but he did it. And Ennis was a part of that. And she drafted it, right? She edited Mr. Mercer's draft of the apology. Then she told him, said, if you want to fight, the fight is you're going to get, didn't she? We have to assume that's true, right? We do have to assume. What does she mean by that? If it's a fight you want, it's a fight you're going to get. What does she mean by that? We don't know, do we? Well, we have Mr. Mercer's conjecture. No, no, we don't, but we don't know, do we? We don't know. Well, we do know. Is that a threat? I suppose it could be construed that way. I think it would have to be, wouldn't it, at this point in the litigation? Again, we forget that in criminal cases it's so easy for us to find every little nuance against the defendant. But here we're almost like, oh, I don't know. It could have meant to have a nice day. It's just a threat, isn't it? Well, Mr. Mercer testified at page 506 of the record that he took the comment to mean he needed to stand his ground and be courageous in fighting for the apology, which the inference there is certainly that Ms. Ennis was on his side in pressing for the apology, Your Honor. And that's what Mr. Mercer said himself at deposition. And it is undisputed as well that Ms. Ennis helped craft the apology, helped arrange the meeting with Mr. Salido and the Diversity Committee, helped set the agenda, and that Mr. Mercer believes Mr. Salido actually thanked him for his efforts once the apology was sent in May 2010. And then there's fast forward to August 26 when the termination was implemented of Mr. Namesman and Mr. Mercer. That's a five-month gap between the protected activity in March and the termination. So even if Ms. Ennis made the comment, Your Honor, it's an isolated statement without a nexus to that termination decision. And that is not enough to put any sort of retaliatory taint on the employment action. With the five months difference between March and August, the legitimate, non-discriminatory, non-retaliatory reason of call flipping as the basis for the termination, the lack of any record evidence whatsoever that the investigation was otherwise tainted, the lower court was correct in granting summary judgment to PHH. Mr. Mercer cannot show pretext or otherwise rebut PHH's legitimate reason for the termination, much less meet the what-for causation standard. For those reasons, this Court should affirm the Judicial Court's judgments on both claims. Unless the Court has any questions, I will sit. Thank you. Thank you, Your Honors. Real quickly, to mention in rebuttal one response, the alleged five months between the March incident and the firing is eight. You better do more than that, Counselor. You've been saying that you've mischaracterized the facts of this case. And I would strongly disagree with that. I think you better more than strongly disagree. You better tell us why it is correct that it is a factual question. It strongly is. That's what rebuttal is for. So don't tell me about five months. We can count on the calendar. I'm talking about saying that you don't even have any facts that even suggest that this was anything other than just normal reaction to your client doing something wrong. Tell us why that's not absolutely categorically correct. Because, Your Honor, if you look at the sealed record and the appendix. You tell us the facts. You know the record. Well, Your Honor, the facts are very strong. What is the facts of dispute that he confessed? That he actually engaged in this flipping. Did he confess? Your Honor, as to that point, he did not confess to doing any wrongdoing. What he did agree to is what I earlier attempted to say in that he did not direct it. He was simply following an order from Tim Mackin, who was a temporary person put in charge. Tim Mackin was put in by Kim Bolin, who reports to my understanding is in the record reports to Rita Ennis and ultimately up the chain. Your Honor, Tim Mackin, it's a material dispute in this record whether or not he ordered my client and Mr. Neisman and others to engage in placing individuals on hold during the busiest moving season. My client is very clearly on record saying he didn't agree with it. He opposed it. That's clearly in the record. And Mr. Neisman is the only individual who gave written orders, and that's what I said earlier, who gave written instructions to employees to do this. Did your client give oral instructions to do it? Your Honor, I think the record indicates that he may have engaged in communications about the process. But in terms of ordering any employees to do it, I don't know that the record supports that. I don't recall seeing that in the record, Your Honor. Did he engage in it? Your Honor, engage in what? And that's the issue I want to point to. Engage in call flipping. Yeah, and that's what I – because the term call flipping is actually a materially disputed fact because of the fact that the employer provided a password to what's called a skill 427. Skill 427 is a particular exchange that calls are being placed into that Mr. Mercer and his team could not have accessed without Tim Macken's password approval. Now, it's in dispute whether or not this particular heavy call volume, you know, provided an opportunity to place calls on hold and whether or not that so-called call flipping is a material dispute, in fact, because the target was two minutes on hold. Well, in the firing – Okay, I'm looking at the – Yes, sir. I'm looking at – I believe it's Mr. – well, I'm not sure. Let's see. Would that be call flipping? Your Honor, actually, there's multiple different allegations in the record that are disputed. There's a term called triage, which I think may be – Okay, my question was a little different. I believe that there – and I'm trying to find it – that there is testimony in the record in which Mr. Mercer indicates that he did do that, so not what I just described. There's actually an affidavit from Kyle Rhodes stating that Tim Macken ordered her to do it and she did not do it, but my client objected to it and did, in fact, obey and place calls on hold longer than the target of two minutes. Whether or not there were actual – as Your Honor was asking – actual individuals he was transferring them to, I think the testimony from Mr. Naseman was that there were those individuals who were supposed to take calls and were not actually taking calls, and I think that is in the record. But the issue, Your Honor – you had asked earlier about whether Ms. Ennis had actually initiated the investigation. Your Honor, I would point to the appendix that's filed, and I would submit, Your Honor, that she's actually part of the firing process. But in terms of the initial initiating, that's not the test. It was my question. Right. That's okay. I mean, if you couldn't find it, that's absolutely – I understand it's a big record. She's copied on the firing letter. She's actually part of the confidential investigation under page 588. She's listed as a copied individual. She was intimately part of – according to Mr. Salito, who made the egregious statements, he pointed the finger to Rita Ennis as the person who actually fired my client. So the inference in the record is strong that she played a part from the beginning of the investigation, but I don't – I can't point you to saying that she initiated. But that's not the test here. The test under Burlington is not whether she initiated it, but whether a reasonable employee – it's the reasonable worker standard – whether or not they perceived that there could have been a chilling effect in the process. And with 15 days from the time that the initial email was sent to the time that actually began the process of the alleged – the statements by Kim Boleyn to the time less than 10 days, business days after that, when the investigation began under Kim Boleyn, which is in the record – and by the way, Your Honor, she claims in her affidavit, minor recollection in her affidavit, she does not claim that she began the investigation. However, the investigatory notes indicate that – and I read from page 589 in the sealed appendix – that Danny was asked by Kim – this is under Friday, 7-23 – Danny, the investigator, was asked by Kim Boleyn to conduct quality phone monitoring for the BTR Department beginning in late June. So – but, Your Honor, the lower court cited a case that actually has been overturned in this regard. Burlington overturned the Lowe case, and I think that is clear error. I think if you focus on the Burlington standard or the reasonable worker standard, my client needs to have his opportunity to put this before a jury, Your Honor, on both the racial and the – Maybe I misunderstood you, and maybe I apologize, and I did, but I thought you said that we had to take some negative inference from in his statement about do you want to fight. I thought this was what you meant. Absolutely, Your Honor. Oh, but counsel said that – that's what I thought you did, too. That's why I asked that question of counsel, but he said in your deposition, your client admitted that he saw it a different way, almost supportive. Is that right? I would strongly disagree with that characterization. We're in the record. Can you help me? I'm reading Mr. Mercer's deposition testimony. Yes, Your Honor. In his deposition testimony – and I don't have the page number, it is cited in my brief – but in his deposition testimony, he specifically says that he wasn't sure at first what she was meaning, and counsel goes on in cross-exam to ask him, when did the context happen? And he said, it was when I was asking for him to send the email, and she said, if it's a fight you want, it's a fight you will get. And he felt – ultimately, he understood when he was fired what that meant. I thought that's what you said. But anyway, your point was, I think, when you first started, you said the five months of firing is really not the test of proximity. The proximity is the two weeks after this, it started. Absolutely. The causal connection in the proximity test is very clear, and I think that's a clear error. It's a material fact and dispute. The beginning of the protected activity is not the measurement date. It's the activity of when he demanded and insisted upon the email to be sent out. And, Your Honor, my client sincerely believed that they could move forward. His whole job as a diversity chairman was requested by the company, and his insistence was with this new CEO to try to provide healing for not just himself but multiple complaints and not just of minorities, which this is an approximate 60 percent minority audience in the Baltimore area. This is also non-minority people coming forward with complaints. Kyle Rhodes is a white woman who filed an affidavit in the record, and she was outraged, and she claims to have had a personal conversation with Mr. Salito, and in that conversation she indicates that he made these defenses of these inflammatory statements, which in Mr. Salito's deposition he categorically disagreed with. So there are material disputes here that are very, very informative for a trial, and I would ask, Your Honor, as I see my time has expired, I would ask, Your Honor, to please reverse and remand on both cases. Just to clarify, for your retaliation claim, Mr. Mercer's race is of no moment, correct? His race is not required as an element at all, right? Absolutely. You're correct, Your Honor. It could have been a Caucasian. The first point is that they are speaking out boldly against these offensive racial statements. Yes, Your Honor. And that is protected no matter what your color is, correct? That's absolutely correct, Your Honor. Two weeks later they bring an investigation against him and other people. That's right, Your Honor. And you said the triage thing that he came up with, that was okay with them, wasn't it? That was actually ordered, and Kim Boleyn actually equivocates. If you look at the investigative notes, Your Honors, Kim Boleyn is the manager who claims that she never ordered the placing of calls on hold, but here's what she says in her investigative notes. She claims that it was an unauthorized use of that particular skill 427, that she never actually said to place them on hold that long, or similar words. And she also clearly states triage is part of the plan. And my client had been requesting, of the new CEO and others, for additional workers, and they did not provide the level of additional help. And so the end result was my client's call center team was inundated. The testimony from Tim Mackin was 1 to 4,000 calls a day. And his team had a very small number of people, half of which were temporary students, who Tim Mackin testified as well that many times did not show up for work. And my client was informed and instructed on how to manage that through various mechanisms, including triage, including skill 427, and including being informed and instructed by Mr. Mackin that he needed to, if he did not have the assistance or the available resources, to place them in a call hold system with skill 427. And in the context of that, Your Honors, the actual problem is confirmed by other managers who had those discussions with Kim Boleyn, who claims that there was a discussion in the meeting where Ford Motor Assistance, Your Honors, was brought up as doing a similar practice, and that manager objected to doing that. The point is this is not a cut-and-dry type violation. Like this is still a can of beans off the shelf. You did or you didn't. But here you have to kind of understand the context of what they're saying, what the pressures were, and all those things. If you assume all those things against your client, then I guess you would say it's undisputed. And that's the case here because the pretext is at issue. And in the light most favorable of my client, that has to be a determination made by the jury, Your Honor. Thank you so much. Thank you so much. All right.
judges: Roger L. Gregory, Allyson K. Duncan, Henry F. Floyd